## Grier Estate (No. 2)

*Peck, Young & Van Sant* and *W. Albert Sanders*, for accountants.

*Philip A. Bregy, Ralph C. Busser, Jr., George Chimples, J. H. Churchman, Joseph N. DuBarry, IV, Wil-*

liam C. Ferguson, Jr., Donald O. Hovey, A. J. Drexel Paul, Jr., Thomas Hart, H. Clayton Louderback, Samuel W. Morris, A. David M. Speers, Paul Van Reed Miller, Albert C. Weymann, Jr., and Helen M. Wilcox, for claimants.

E. Louis Rosen, for City and School District of Philadelphia.

Louis Marion, for Commonwealth of Pennsylvania.

KLEIN, P. J., July 23, 1963.—Jay R., also known as Jay Rich, Grier, a respected member of the Philadelphia bar, died on June 13, 1958, unmarried and without issue, leaving a will, which was admitted to probate on June 18, 1958.

All of the facts and circumstances in connection with the administration, audit and distribution of Mr. Grier's estate appear fully in the adjudication of Shoyer, J., dated October 21, 1959, on the executor's first account and in the opinions of this court en banc on exceptions, [20 D. & C. 2d 751] and of the Supreme Court on appeal [403 Pa. 517 (1961)].

The fund presently accounted for was awarded back to the present accountant by schedule of distribution approved by Shoyer, J., October 6, 1961, "subject to payment of Federal Estate tax and Inheritance tax; subject to payment of Principal Personalty commissions and fees; and subject to further accounting." (Emphasis supplied)

Credit is taken in the account for "A. W. Norman, Executor's commissions of 5% on first $100,000 of principal assets and 3% on balance, said assets totalling $656,998.55, which equals $21,709.95." Credit is also taken for $27,500 counsel fee to Peck, Young and Vansant. Payments on account thereof in the sums of $7,000 against the former, and $5,000 against the latter, were credited in the first account and are reflected in the second account which is before us for audit.

Objection was made to these charges by counsel for the various charitable remaindermen. Although the objectants were not in agreement as to the amounts which should be allowed, they indicated that they thought the total of commissions and counsel fees allowed should be somewhere between $32,000 and $35,000.

Jay R. Grier, the decedent, was an unusual man and, in the opinion of the auditing judge, the administration of his estate was uncommonly difficult and complex. When he died on June 3, 1958, he was in his eighty-eighth year. He had never married. He had been a lawyer since 1891 and specialized in probate matters.

More than five years have passed since testator's death and the administration of his estate has not yet been completed. This delay is due primarily to the ambiguous will personally prepared and typed by testator.

Decedent's next of kin contended that he had failed to dispose of the residue of his estate and that an intestacy resulted. The remaindermen contended that he had made a complete disposition of his entire estate. Shoyer, J., the auditing judge, agreed with the remaindermen. Exceptions were filed and the auditing judge was reversed by his colleagues. On appeal, the Supreme Court [403 Pa. 517 (1961)] reversed this court, two justices dissenting. This is recited only to indicate the troublesome nature of the question created by testator's poor draftsmanship of his own will.

Litigation over the construction of the will not only prolonged the administration, but created many tax problems. The impact of Federal estate taxes would have been entirely different if the residue went to individuals, rather than to exempt charities.

Moreover, in addition to the problems created by testator's badly drawn will, the administration was made exceedingly difficult by the confusing manner in

which decedent handled his business, both personal and professional. He did not employ a secretary and no one knew anything about his affairs. His files and records were in a mess. Consequently, the executor and his counsel were obliged to examine a dozen stacks of files to find the will. All of decedent's assets were either in his home or in the office and in a state of utter confusion. Loose currency totalling $3,500 and coins in the amount of $173 were scattered in different places throughout the office. Every file and folder had to be carefully examined and studied in order to bring order out of the confused state, not only of decedent's affairs, but also those of his clients. Mr. Norman testified, at page 20:

"A. Well, I would say I went through every file and looked through every folder. I wouldn't say I looked at every paper, but I examined every file and every folder to see whether it was of some importance. It might be unfinished business. He had some unfinished cases and we had to set aside and dispose of them as best we could in our best judgment. He had income tax files for himself and clients. He had what you might call current papers regarding the administration of estates, court cases in which he was the representative, and that took several weeks. In addition to that on top of his library book cases he had papers stacked from the bookcases to the ceiling, and on his iron safe he had papers almost to the ceiling, and I had to go through them to make sure we were not disposing of anything of value to the estate."

In view of the litigation which prevented the executor from promptly ascertaining to whom the residue was payable, his administration was protracted and took on some of the characteristics of an administration by a trustee. Section 506 of the Fiduciaries Act of 1949, as amended by the Act of November 10, 1959, P. L. 1463, provides:

"*INVESTMENT OF FUNDS*—Subject to his duty to liquidate the estate for prompt distribution and to the provisions of the will, if any, the personal representative may invest the funds of the estate but shall have no duty to do so. Any such investment, except as the court or the will may otherwise authorize or direct, shall be restricted to obligations of the United States or the United States Treasury, of the Commonwealth, or of any political subdivision of the Commonwealth."

The executor took full advantage of this section and purchased short term United States Government securities. As a result of his prudent management, the value of the estate was enhanced substantially, while awaiting the outcome of the litigation.

With this background, let us examine the credits taken by the executor and his counsel.

We will first discuss the executor's compensation. Mr. Norman, the executor, is 86 years of age and retired but still reasonably active and alert. He is a certified public accountant, as well as a lawyer admitted to practice in our courts. Since he is a certified public accountant, his right to employ other accountants to assist him in the administration of the estate has been questioned. The objectants have also charged that considerable of the work which Mr. Norman was obliged to do, as personal representative, was performed by his attorney. There appears to be some justification to both of these contentions.

Mr. Norman has taken credit for five percent on the first $100,000 in the estate and three percent on the remainder, in the total amount of $21,709.95. This he is not permitted to do. Graduated commissions, diminishing in higher brackets, are forbidden in this State: Williamson Estate, 368 Pa. 343 (1951).

After carefully studying the entire record in this case, the auditing judge has reached the conclusion

that a total allowance of $18,500 would be fair and reasonable under all of the circumstances. The accountant will accordingly be surcharged with the difference of $3,209.95.

We will now direct our attention to the credit for counsel fees to Peck, Young and Van Sant in the sum of $27,500.

The residue of this substantial estate was left to a great many charities. Counsel for a number of them appeared at the audit to enter objections to the fees paid to counsel. The following colloquy appears at page 12 of the notes of testimony:

"THE COURT: To me the most distasteful and unhappy litigation in this Court involves objections to counsel fees and executor's commissions. Have efforts been made to adjust this? Is there a committee of the legatees or anybody authorized to speak for them?

"MR. BREGY: There was a committee to argue the legal point of the construction of the will. That committee felt it could not handle the matter of counsel fees and commissions. *When there are fifteen different lawyers, there are fifteen different opinions on commissions and counsel fees.* We did not think the committee could continue representing everybody." (Italics supplied.)

It is indeed unfortunate that here in Philadelphia, which proudly boasts that its bar association is the oldest organized bar in the United States, a group of our leading attorneys can work together harmoniously to resolve an intricate question of testamentary construction, but cannot agree upon an appropriate amicable procedure with respect to the compensation of respected and honorable fellow members of the bar for services well performed and free from any criticism or complaint.

There are no certain or scientific rules to govern the determination of disputed counsel fees. Each is *sui*

*generis* and dependent upon many factors and circumstances. Broad basic principles have been enunciated to assist judges in arriving at fees which are fair to attorney and client, alike, but it is much easier to state the rule than to apply it. In Huffman Estate (No. 3), 349 Pa. 59, 64 (1944), the court said:

" 'The things to be taken into consideration in determining the compensation to be recovered by an attorney are the amount and character of the services rendered, the labor, the time, and trouble involved, the character and importance of the litigation, the amount of money or value of the property affected, the professional skill and experience called for, and the standing of the attorney in his profession; to which may be added the general ability of the client to pay and the pecuniary benefit derived from the services': Hanley v. Waxman, 80 Pa. Superior Ct. 274, 276; Robbins v. Weinstein, 143 Pa. Superior Ct. 307, 314, 17 A. (2d) 629."

This is not a new rule. It can be found in somewhat similar form in "Legal Classic Series, Mirrour of Justice",* written by Andrew Horne, who died in 1328, in which we find the following statement dealing with the serjeant's, i.e. attorney's, fees:

"4. The fourth thing is his salary, concerning which four things are to be regarded; 1 The greatness of the cause. 2 The pains of the serjeant. 3 His worth, as his learning, eloquence and gift. 4 The usage of the court."

Applying these rules to the present case, we find that we are dealing with a substantial cause. The gross estate, including the interest earned during its administration, totals almost $800,000. There can be no question that Peck, Young and Van Sant are able lawyers, thoroughly experienced in orphans' court

---

* Introduction by Hon. William C. Robinson, LL.D., Whiteford Professor of Law in the Catholic University of America (1903).

practice and procedure. They enjoy the confidence and respect of the court and have served their client in the present case with fidelity and intelligence in a completely efficient and satisfactory manner.

Some of the objectants contend that the fee awarded to counsel should be not in excess of $11,000, the amount fixed in the Minimum Fee Schedule adopted by the Philadelphia Bar Association. This position is unsound. The Minimum Fee Schedule suggests only minimum fees. It should not be perverted to mean maximum fees. Admittedly, rare cases may arise in which the fees listed in the schedule are excessive. In many situations, however, they are wholly inadequate. As we have said, each case is sui generis. However, we must recognize that these schedules have been adopted by the bar associations throughout the country as guides to assist lawyers in evaluating their services. They are intended to protect the economic status of the legal profession, not to restrict or debase it.

The legal profession appears to be suffering from an unwarranted but deep-seated mass inferiority complex. As a result, it has failed to keep pace with other professions in taking steps to protect the economic status of those of its members who are encountering great difficulty in earning a living from the law.

It is ironic that the incomes of thousands of able, well-trained lawyers in the United States, after attending college and law school for a total of seven years, are no greater than the incomes of many artisans in the construction trades and other workers in unionized industries with less than high school educations. Fortunately, most lawyers make comfortable livings from their practices. Undoubtedly the very small and select top echelon of the profession is doing exceedingly well and enjoying very substantial incomes. It is also true, however, that the earnings of many of the rank and file of lawyers are not sufficient to support

and maintain their families in a manner consistent with the dignity of members of an honorable and learned calling. This is a situation which requires considerable study if it is to be corrected.

Historically, the courts have protected the members of the medical profession and permitted them to charge for their services on the basis of the patients' ability to pay. In Pfeiffer v. Dyer, 295 Pa. 306 (1929), Mr. Justice Schaffer (later Chief Justice), speaking for a unanimous Supreme Court, said, at page 310:

"Pressed on cross-examination to state his customary fee for such an operation as that here involved, he said that in over twenty years' experience in surgery he had performed the operation six times, three times for nothing, and in explanation added that over half of his professional work was done for charity. This state of affairs the law must recognize, that physicians should not have their services valued as you would commodities in trade by a fixed standard; what would be a proper charge for the same service to a man fully able to pay would be excessive to a man of limited means, and what would be willingly done for the indigent without thought of financial reward should be compensated for by one who can afford to pay on the scale which doctors of repute measure as the proper one. Only on such a basis can those who devote their lives to ministering to human suffering in some degree be fairly paid: Succession of Levitan, 143 La. 1025, 79 So. 829; Young Bros. v. Succession of Von Schoeler, 151 La. 73, 91 So. 551. As was said in the Levitan Case: 'It is a matter of common information that physicians and surgeons do not regulate their charges by any fixed standard of pecuniary value, but, to a certain extent, base them on the ability of the patient to pay, and, on that basis, more frequently than otherwise, perhaps, are but poorly compensated.' "

Why is the practice of law different from the prac-

tice of medicine in this respect? Certainly, the services rendered by members of the legal profession are essential to preserve peace, order and security in our society. Without the services of lawyers, our way of life would be seriously endangered, might well deteriorate into chaos or tyranny.

A recent report on the 1962 Economic Survey of Lawyers Practicing in Philadelphia, prepared by Daniel J. Cantor and Co., consultants to the legal profession, analyzed the work day of Philadelphia lawyers. The report reveals that lawyers practicing in this city worked an average of 2,036 hours in a year, of which 1,461 hours, or 72 percent were compensated for and 575 hours, or 28 percent, were not compensated for. Of each working day of eight hours, two and one quarter hours was devoted to unpaid work. Why should not this uncompensated work be taken into consideration in fixing the fees of lawyers, as is done in the case of physicians?

There is more to the practice of law than just serving clients for pay. Hence, it is not completely fair to examine minutely the services rendered by a lawyer in a particular case, without some recognition of its relationship to his practice as a whole. It is common knowledge that a lawyer is not infrequently called upon to represent clients who cannot compensate him. Often the client is too poor to pay for the representation he requires. In many cases the services are of a public nature, or for a charitable institution, or to settle a question of law affecting the rights of the community as a whole.

One of the serious matters which has been plaguing the bar as a whole is the fantastic increase in the cost of operating law offices. Office rent, secretaries' salaries, law book prices, the prices of furnishings and required equipment and all the other myriad, miscellaneous items of expense involved in practicing law

have risen sharply. The legal profession, as much and perhaps more than other professions and callings, is feeling the impact of the inflationary trends which have engulfed the country, resulting in a marked depreciation in the purchasing power of the dollar. This should be a matter of grave concern to all responsible, thinking people.

If it is conceded that a lawyer is a member of an honorable, useful profession, entitled to an income sufficient to enable him to live on a scale comparable to the members of other professions, it seems to follow that the client with the means to pay should adequately compensate his lawyer for the services he receives. This does not necessarily mean that client "A" should be asked to pay for services rendered in behalf of client "B". What it does mean is that in a case such as the one before us, in which counsel has rendered extensive and efficient services in settling a substantial estate, the court should approach the problem in a benign spirit and, consistent with a due regard for the rights of the parties affected thereby, make certain that the counsel fees which are awarded are completely fair to counsel, taking into consideration the changing social and economic conditions in our society.

In the present case, counsel did much more than merely settle the estate of a decedent. They also closed out the practice of an aged lawyer, who was a member of the bar of the court for over 65 years and who had failed a great deal during his last years. Many months were spent by counsel in reviewing decedent's files to ascertain which cases were current and needed further attention and to determine what steps were necessary to protect the interests of the estate. Mr. Young testified, page 41:

". . . We had to subsequently review all of the files in the decedent's office. As we counted them, there were ten sections of transfer files, eight drawers of filing

cabinets, the contents of nine security boxes, two roll-top desks, a breakfront bookcase, a combination safe and hundreds of papers filed on top of the files and the desk."

It was necessary for counsel to file accounts in four trusts in which decedent was trustee, in order to bring those estates to a close and to obtain the discharge of his estate. In another case, letters testamentary had been granted to decedent approximately six months before his death, and he had taken no steps to administer the estate. Counsel had to complete this administration. Counsel also had to ascertain which files and papers such as original wills, for example, should be returned to decedent's clients. Moreover, the litigation involving the construction of decedent's own will, and the fact that 24 charities were involved in the distribution, added in a large measure to the burdens of counsel.

The auditing judge is satisfied and finds as a fact that Peck, Young and Van Sant, were required to render services greatly in excess of those which ordinarily would have been required in an estate of this size. The auditing judge is, therefore, of the opinion that the total fee of $27,500, for which credit is taken in the two accounts, is fair and reasonable under the circumstances of this case. Accordingly, the objections thereto are dismissed.

The approval of commissions in the sum of $18,500 to A. W. Norman, the executor, and counsel fees of $27,500 to Peck, Young and Van Sant is made with the understanding that no further commissions or counsel fees will be requested by the executor or his counsel and that the administration of the estate will be concluded by them without further charge. . . .